MR. JUSTICE SHEEHY
delivered the opinion of the court.
This appeal is taken from a judgment denying Olson’s petition for release from the State Hospital in Warm Springs. Findings of fact, conclusions of law and judgment were entered on August 14, 1978, in the District Court of Lincoln County by the Honorable Robert M. Holter.
In 1969 Olson was charged with two counts of rape. He gave notice of intent to rely on the defense of insanity. The case was submitted to the jury and a guilty verdict was returned. On appeal the judgments were reversed and a new trial was ordered. State v. Olson (1971), 156 Mont. 339, 480 P.2d 822.
Before the second trial the judge found Olson “not guilty” by *325 reason of insanity and order him committed to the State Hospital on March 18, 1971. The commitment order referred to the depositions and testimony of Drs. Miguel F. Gracia and Robert A. Wetzler, qualified psychiatrists who had examined Olson.
In 1972, Olson walked away from the Warm Springs facility and went to Great Falls. From 1972 until 1977 Olson lived in Great Falls with his wife and family. He obtained a job, had telephone directory listing, and a driver’s license all under his own name. He joined both a local union and the local chapter of the Moose Lodge, again using his own name.
On February 17, 1977, an order was entered for the issuance of a bench warrant directing:
"IT IS HEREBY ORDERED,
“That Bench Warrant issue for the arrest of the captionéd Defendant, Raymond LeRoy Olson, and that he forthwith be returned to this Court for purposes of determining whether he should be released from custody of Warm Springs State Hospital without Bail.” (Emphasis added.)
Olson’s period of residence in Great Falls was not completely without incident. In September or October of 1976 Olson unexpectedly appeared in the bedroom of one Karla White at about 2:00 or 3:00 a.m. while she was sleeping. Olson left when told to, although, as State contends, the presence of 'White’s male companion may have hastened his retreat.
A year later on September 1, 1977, Olson assaulted the same woman in the early morning hours. In this attack, Olson grabbed White, knocked her down, and shoved her face into the concrete, threatening to break her neck. Olson apparently did try to snap White’s neck before dragging her off into a vacant field. Although there was no sexual assault, Olson’s continuing physical assault was interrupted only by the arrival of the police. Olson claims he was upset over White’s treatment of her ex-husband, Olson’s friend. This incident led to Olson’s arrest and being charged with misdemeanor assault and unlawful restraint. The charges were ultimately dismissed.
*326 Although the order of February 17, 1977, directed that there be a hearing to determine Olson’s status and although he was taken to Kalispell and held in jail for at least a week, there was no hearing and he was returned summarily to the State Hospital.
On December 27, 1977, Olson petitioned for release. He was subsequently examined by Dr. Hamilton C. Pierce and Dr. George Gelernter, both qualified psychiatrists, whose reports were introduced as exhibits at the hearing on August 3, 1978. In addition to these evaluations, Olson and his wife testified and 35 letters of personal reference from Olson’s supervisors, co-workers, and friends were introduced as exhibits without objection. Finally, an interim social history and a mental status examination report and evalutation prepared during Olson’s confinement at Warm Springs in late 1977 were submitted on Olson’s behalf. The substance of these reports as well as of the evaluations by the two private psychiatrists was that Olson suffered no mental illness and should be released.
The State, in opposing the petition for release, introduced parts of the psychiatric evidence from the 1970 rape trial, specifically the testimony of Dr. Wetzler, along with testimony from Karla White, the woman Olson allegedly attacked in 1977.
The District Court denied Olson’s petition citing in its findings the testimony of Dr. Wetzler in 1970 that Olson had a “grave defect, a grave illness,” that the two incidents involving Karla White were similar to the original rapes, and that Olson had received no psychiatric treatment since 1972. The final finding and conclusion of the District Court were:
“5. That this Defendant is now suffering from a mental disease or defect which renders him unable to control himself at times and which results in his being a danger to the person of others.
“[Conclusions of Law] That the Petition of the Defendant for release from the Montana State Hospital should be denied by reason of the fact that this Defendant remains a danger to the person of others.”
*327 Olson was ordered returned to Warm Springs State Hospital. From the denial of his petition, Olson appeals.
Olson broadly asserts that the issue for review is whether the District Court erred in denying his petition. The State breaks this issue down and addresses the points Olson pursues:
1. Whether the transcript of Dr. Wetzler’s testimony from the prior trial was admissible.
2. Whether the District Court could rely on the testimony of the woman Olson allegedly attacked.
3. Whether the evidence was sufficient to support the District Court’s judgment.
By this appeal from the denial of his petition for release, Olson specifically challenges the use of the testimony of two witnesses by the lower court: (1) the transcribed testimony of Dr. Wetzler as given in Olson’s 1970 rape trial; and (2) the testimony of Karla White as to two incidents involving her and Olson. We- will consider the testimony of each separately.
Testimony of Dr. Wetzler. This testimony as presented to the District Court by the State consisted exclusively of the transcript of Wetzler’s testimony at Olson’s trial in 1970. This testimony was based on Wetzler’s two-hour examination of Olson in January 1970. Wetzler has neither examined Olson since 1970, filed any sort of updated evaluation, nor did he appear at the hearing on Olson’s petition. In short, this transcribed testimony relates to Olson’s mental condition as of January 1970.
Olson petitioned for release under section 95-508, R.C.M.1947, now sections 46-14-301 through -304 MCA, which established the procedure for commitment to and release from the State Hospital at Warm Springs following acquittal on the ground of mental disease or defect. The provisions of that section clearly call for a determination of the mental condition of a committed person as of the time of the petition for release. E. g., section 95-508(1) (hearing “to determine his present mental condition”), (2)(requiring the appointment of two psychiatrists to examine the person after the filing of a petition), now séction 46-14-301(2) and 46-14-302(2) *328 MCA. Accord, Rouse v. Cameron (1966), 125 U.S.App.D.C. 366, 376, n. 43, 373 F.2d 451, 461 n. 43; State v. Cuvelier (1978), 175, Conn. 100, 394 A.2d 185, 189; State v. Fields (1978), 77 N.J. 282, 390 A.2d 574, 585; People v. Giles (Colo.1976), 557 P.2d 408, 411-12.
While perhaps this Court has not decided the exact question presented by Olson, we have decided that evidence of mental condition as several years before the commission of a crime, State v. Neel (1978), 177 Mont. 93, 580 P.2d 456, 459, or as of several years after the commission of a crime, State ex rel. Main v. District Court (1974), 164 Mont. 501, 508-09, 525 P.2d 28, 32, is not sufficient evidence of mental condition at the time of the commission of a crime. The reverse is also true; evidence of mental condition at the time of the commission of a crime is not sufficient evidence of mental condition some eight years later upon petition for release. Powell v. Florida (5th Cir. 1978), 579 F. 2d 324, 330.
We are reluctant, however, to hold that testimony of mental condition at the commission of a crime is always inadmissible on the question of mental condition at some point later upon petition for release. For example, under section 95-508(1), now section 46-14-301(2) MCA, a person committed to Warm Springs State Hospital following acquittal is entitled to a hearing within 50 days of confinement to determine his present mental condition. In such cases, the earlier testimony may be helpful to the District Court in evaluating the acquittee’s mental health. People v. Turner (1978), 62 Ill.App.3d 782, 19 Ill.Dec. 713, 715-16, 379 N.E.2d 377, 379-80. As the interval between the original evaluation and the subsequent petition for release lengthens, however, this earlier testimony loses i,ts probative value. In this case, where eight years elapsed between the original evlauation and the subsequent petition for release, with no intervening examination by the witness, the probative value of the earlier testimony of the witness in judging the present mental condition of Olson is questionable.
Our conclusion is strengthened by the other testimony and evidence in the record before the District Court. Included in this *329 evidence were evaluations of Olson by other psychiatrists or psychologists. These evaluations, contrary to that of Dr. Wetzler, were based on examinations of Olson in late 1977 and early 1978 after his return to Warm Springs. The later evaluations are unanimous in their findings that Olson no longer suffers from any mental disease or defect and that he should be released from confinement at Warm Springs.
Thus, in the words of Dr. Hamilton Pierce:
“In summary, I see no evidence of mental illness in this patient and I doubt if he ever has mental illness to the degree that could be considered a cause of his antisocial activities. He is an impulsive person and he has relatively weak controls which are weakened more by his tendency to drink. I do not see him as mentally ill now or in the past.”
Dr. George Gelernter, also of Great Falls, concluded:
“At this point, I find no evidence of serious emotional illness. Incarceration at the State Hosptial would seem to serve no purpose other than custodial, since there is no ‘treatment’ facility there that would be meaningful to him. If the legal aspects of his charges required incarceration, it would seem more appropriate at the State Prison in Deer Lodge if the purpose is purely incarceration.”
Finally, the District Court had before it a packet of evaluations prepared by the psychiatric staff at Warm Springs. In these evaluations, the examining social worker, “question[ed] the appropriateness of [Olson’s] current incarceration.” The discharge summary signed by Dr. Harry Xanthopoulos and others states:
“Significant Findings:
“It was the findings of the Forensic Region team that he was suffering from no mental disorder and that he was not appropriately in the hospital ...”
The final diagnosis of Olson by the staff at the State Hospital states that he has no mental disorder.
[I] Comparison of the psychiatric testimony presented by the State with that presented by Olson leaves no possible conclusion *330 other than that Olson has established by a preponderance of the psychiatric evidence that he is entitled to be released. Section 95-508(3), R.C.M. 1947, now section 46-14-302(4) MCA. We therefore proceed to an examination of the testimony of Karla White.
Testimony of Karla White. Unlike the testimony of Dr. Wetzler, the testimony of Karla White is not subject to attack on the basis that it is not timely or relevant. Her testimony concerns incidents involving Olson which occurred within about fifteen months of his filing a petition for release. One of these incidents resulted in Olson’s arrest and return to Warm Springs. The testimony is undoubtedly damaging to Olson’s case. See, People v. Giles (Colo.1976), 557 P.2d 408, 412. Given our conclusion as to the current value of Dr. Wetzler’s 1970 testimony, however, the question becomes whether White’s testimony, standing alone, justifies Olson’s continued confinement at Warm Springs. We conclude that it does not.
White, as noted earlier, testified concerning two separate incidents involving Olson which occurred a year apart. In the first incident, Olson appeared uninvited in White’s bedroom in the early morning. He later explained he had been trying to rouse White for about an hour and when he failed, he called her mother who supposedly asked him to check on her. Olson did leave when told to by White. The circumstances of this incident and the manner of Olson’s behavior possesses only a superficial similarity to his sexual attacks in 1970.
The second incident to which White testified was the time that Olson suddenly appeared as White was getting out of her car, knocked her down, and pushed her face into the concrete before dragging her to a nearby vacant field where he continued to press her face into the grass. White’s recount of what Olson said to her during his attack is illuminating:
“Q. What happened next? A. We more or less just were talking. He asked me if I knew why he was doing this to me, and if I wanted *331 to know, and I said, ‘Yes, I do.’ He said he was doing it for my sister.
“Q. What happened next? A. He told me that it was not me he was after anymore; that it was my husband, and that I should get up and run along towards the road and not turn around and just run.” (Emphasis added.)
Again, there was no sexual assault or conduct of any kind. This incident also is very dissimilar to the earlier sexual attacks and apparently had for its motive not sexual assault but revenge for a friend apparently wronged. Cf. State v. Hesse (1977), 117 N.H. 329, 373 A.2d 345, 347 (defendant, acquitted of assault on a black man because of insanity, assaulted a black man after escape from hospital). Olson was charged only with simple assault and unlawful restraint, both misdemeanors. Both charges were eventually dismissed.
White’s testimony as well as Olson’s special status at the time of the attack leads us to review the entire statutory scheme for the commitment and release of persons acquitted of crime because of mental disease or defect. Olson’s special status of which we speak is that of an insanity acquittee on de facto self-imposed “probation” from Warm Springs for a period of over five years from the time he walked away from the State Hospital in August 1972, until his arrest on September 1, 1977.
Our review initially reveals a conflict in these statutes as to whether criminal or antisocial behavior alone warrants confinement at Warm Springs. The Revised Commission Comment to section 95-508, R.C.M.1947, governing release states:
“. . . It seems preferable to make dangerousness the criterion for continued custody rather than to provide that the committed person may be discharged or released when restored to sanity as defined by the mental hygiene laws. Although his mental disease may have greatly improved, such a person may still be dangerous because of factors in his personality and background other than mental disease. Also, such a standard provides a possible means for *332 the control of the occasional defendant who successfully feigned mental disease to gain an acquittal. The prescribed procedure protects both the public and the defendant by providing for an independent psychiatric examination of the defendant before action on the application for release, and then either for summary favorable action on the application or a full hearing.” (Emphasis added.)
This comment, as well as the language of section 95-508 itself, would seem to indicate that the mere fact of Olson’s criminal assault on White is reason enough to warrant his' continued confinement. The definition of mental disease or defect excluding responsiblity contained in section 95-501, R.C.M.1947, now section 46-14-101(2) MCA, indicates otherwise:
“(2) As used in this chapter, the term ‘mental disease or defect’ does not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.”
The conflict between these provisions is more apparent than real, however. Obviously, the intent of these statutes is to deal with an exceptional class of people who, because of their mental condition, are not to be held liable for acts which otherwise would be considered criminal. State v. Taylor (1971), 158 Mont. 323, 331, 491 P.2d 877, 881. The crucial criterion for inclusion in this case is possession of a mental disease or defect excluding responsibility. Section 95-501, R.C.M.1947, now section 46-14-101 MCA; Powell v. Florida (5th Cir. 1978), 579 F.2d 324, 332. Clearly, under this statute, the mere commission of a criminal act does not place the actor in this exceptional class; neither should the mere commission of a criminal act by a person once deemed to be a member of this class necessarily be contrued as evidence of his continued inclusion in this class.
In Rouse v. Cameron (1966), 125 U.S.App.D.C. 336, 373 F.2d 451, the Federal Court of Appeals was faced with a similar situation and a similar statutory scheme. That court concluded:
“. . . A person involuntarily committed and confined under D.C.Code § 24-301 is entitled to release if he has ‘recovered his *333 sanity and will not in the reasonable future be dangerous to himself or others.’ That the ‘person so confined has some dangerous propensities does not, standing alone, warrant his continued confinement in a government mental institution under § 24-301 D.C.Code. The dangerous propensities . . . must be related to or arise out of an abnormal mental condition.’ ” 125 U.S.App.D.C. at 344, 373 F.2d at 459. (Emphasis added.)
Accord, State v. Cuvelier (1978), 175 Conn. 100, 394 A.2d 185, 189.
In other words, the mere fact that a person may have once been acquitted on the basis of insanity does not forever after insulate him from the sanctions imposed under the criminal justice system in the event of future criminal or antisocial conduct, absent some evidence that his future conduct is somehow related to his mental disease or defect. People v. Dublin (1978), 63 Ill. App.3d 387, 20 Ill.Dec. 354, 380 N.E.2d 31, 35; Lee v. Kolb (W.D.N.Y.1978), 449 F.Supp. 1368, 1382. In short, a sexual psychopath should not be able to rob a bank, for example, and be automatically immune from criminal punishment by virtue of his earlier diagnosed insanity. Neither should the fact that he robbed the bank automatically be taken as evidence of his continuing sexual psychopathy. There must be some demonstrated relation between the two types of behavior.
In this regard, the following discussion in Goldstein & Katz, Dangerousness and Mental Illness, 70 Yale L.J. 225, 237-38 (1960) is informative:
“. . . what disposition is to be made of those acquitted by reason of insanity who remain dangerous — whatever meaning will be given to that word — but who have ‘recoverd sanity’ at least to the extent that they could not longer be held had they been civilly committed? Continued detention would be the statutory answer. But to hold a patient solely for potential dangerousness would snap the thin line between detention for therapy and detention for retribution . . . Not to release such persons would in effect be to equate an undefined ‘dangerousness’ with an undefined mental illness. Since *334 there can be no such equation, a decision not to release solely on the basis of potential dangerousness would be like a decision not to discharge a tubercular patient — though no longer infectious — because he is a potential killer or checkforger . . .” (Emphasis added.)
Evidence that Olson’s attack on White was related to his mental disorder diagnosed in 1970 is lacking in this case. In fact, had Olson first come to the attention of the police as á result of his attack on White and he at that time chosen to rely on the defense of insanity, the defendant would have been unsuccessful because everyone who examined him found no evidence of mental disorder.
Instead the evidence is to the opposite effect. All of the psychiatric and psychological evaluations of Olson performed after his recommitment to Warm Springs were made with full knowledge of his attack on White. Even with this knowledge, these experts determined that Olson suffered no mental disorder as of the time of their examination:
In this connection, the provisions of section 95-508(4), R.C.M.1947, now section 46-14-304 MCA, are relevant:'
“(4) If, within five (5) years after the conditional release of a committed person, the court determines, after hearing evidence, that the conditions of release have not been fulfilled and that for the safety of the person or for the safety of others his conditional release should be revoked, the court shall immediately order him to be recommitted to the superintendent of Warm Springs state hospital, subject to discharge or release only in accordance with the procedure above in subsections (2) and (3).”
As noted above, Olson’s status at the time of his attack on White on September 1, 1977, was unique. He had walked away from Warm Springs in August 1972 and had lived in Great Falls for the next five years. During this period, Olson found a job, joined a union, joined the local Moose Lodge, and apparently established a more compatible, understanding relationship with his wife. The degree to which Olson fit into the community is attested to by the 35 personal reference letters from his employers, friends, and co *335 workers admitted into evidence at the hearing. See, Hill v. State (Fla.App.1978), 358 So.2d 190,205.
In a very, real sense, then, his status was that of a conditional,, albeit self-determined, releasee, the condition frankly being that he avoid contact with the law. For the five-year period specified in section 95-508(4) Olson lived up to this condition.
We recognize, of course, that this section is not directly applicable to a person in Olson’s status. Nevertheless, the intent of the ■legislature in enacting this section was to create a time limit beyond which the State cannot automatically revoke the release of a person once committed to Warm Springs and subsequently returned to the community. Olson did successfully live in Great Falls, under his self-imposed conditions, for longer than this statutory time limit. To take him from his successfully recreated life and return him to an indefinite confinement in Warm Springs on the sole basis of a misdemeanor assault charge carrying a maximum six month sentence offends this intent. Therefore, we think it was incumbent upon the State at this late date to have come forward with stronger evidence than was presented to show that Olson continues to suffer from a mental disorder requiring his renewed confinement at Warm Springs.
The State apparently assumed that it only had to show that Olson at one time had a mental disease or defect and that more recently he had committed an antisocial act without having to show a relationship between the two. This was an erroneous assumption. On the evidence presented thus far, Olson has shown by a preponderance of the evidence he is entitled to his release.
It is not the function of this Court, however, to direct the release of persons committed to Warm Springs State Hospital; that power belongs to the District Court. Section 95-508, R.C.M.1947, now sections 46-14-301 through -304 MCA; Application of Zion (1978), 178 Mont. 468, 585 P.2d 1084, 1090. Given the seriousness of the offenses for which Olson was originally committed, the fact that he has undergone no psychiatric treatment since the time of his “release” from the hospital, the two incidents involving Karla *336 White, and the fact that the State proceeded on an erroneous assumption as to its burden of proof in the previous hearing, we conclude that this cause must be remanded for further testimony on the specific question of whether Olson’s antisocial behavior as illustrated in the incidents involving Karla White have any relationship to any mental disease or defect currently suffered by Olson. People v. Dublin (1978), 63 Ill.App.3d 387, 20 Ill.Dec. 354, 380 N.E.2d 31, 35; Application of Miller (1974), 46 A.D.2d 177, 362 N.Y.S.2d 628, 633-34. The point to be determined by the District Court is whether Olson’s present “dangerousness,” if any, is related to or growing out of the abnormal mental condition he exhibited in 1970.
The mere fact that Olson may have a tendency towards antisocial behavior is not sufficient to warrant his continued confinement in Warm Springs. See, Harris v. United States (D.C.App.1976), 356 A.2d 630, 632. If Olson does not suffer from a mental disease or defect which causes this behavior, there is no reason for continuing to include him in the exceptional class of people discussed earlier. Baxstrom v. Herold (1966), 383 U.S. 107, 114-15, 86 S.Ct. 760, 764-65, 15 L.Ed.2d 620, 626-26. The ordinary punishments of the criminal justice system are adequate to handle Olson’s future criminal conduct, in such circumstances.
We also point our that the District Court is not limited to either recommit Olson to Warm Springs or release him unconditionally. Section 95-508 gives the District Court authority to release conditionally persons committed to the State Hospital by placing such conditions as it deems necessary on the release. But see, Application of Zion (1978), . . . Mont. . . ., 585 P.2d 1084, 35 St.Rep. 1475. On remand, the District Court should not foreclose the possibility of conditional release as a proper means of balancing Olson’s interest in liberty against society’s interest in protection from potentially dangerous persons. Application of Zion, 585 P.2d at 1087, 35 St.Rep. at 1478; Hill v. State, 358 So.2d at 209.
The judgment of the District Court denying Olson’s petition for release is reversed. The cause is remanded for further proceedings consistent with this opinion.
*337 MR. CHIEF JUSTICE HASWELL and JUSTICES DALY and SHEA concur.