No. 14938

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

---

THE STATE OF MONTANA, on the
Relation of RAYMOND L. OLSON,

        Relator,

   vs.

THE DISTRICT COURT OF THE NINETEENTH
JUDICIAL DISTRICT OF THE STATE OF
MONTANA, IN AND FOR THE COUNTY OF
LINCOLN, and HON. ROBERT M. HOLTER,
DISTRICT JUDGE, THEREOF,

        Respondents.

---

ORIGINAL PROCEEDING:

Counsel of Record:

    For Relator:

        Randono, Lewis & Donovan, Great Falls, Montana

    For Respondents:

        Hon. Mike Greely, Attorney General, Helena, Montana
        William A. Douglas, County Attorney, Libby, Montana

---

        Submitted on briefs: October 1, 1979

                Decided:

Filed: NOV 21

*Thomas J. Kearney*
                  Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

Raymond Olson petitions and appeals from an order of the Lincoln County District Court, setting aside a previous order which found Olson "not guilty" by reason of insanity and ordering him committed to the State Hospital.

Olson was charged in 1969 with two counts of rape. Olson gave timely notice of his intent to rely on the defense of insanity. The case was submitted to the jury. The jury returned a guilty verdict upon which two concurrent sentences of 60 years were entered. The sentences were subsequently reversed on appeal. State v. Olson (1971), 156 Mont. 339, 480 P.2d 822. Upon remand the trial court held a hearing and determined Olson not guilty by reason of insanity and ordered him committed to the State Hospital on March 18, 1971. The commitment order hereinafter referred to as the 1971 order, referred to the 1970 testimony and depositions of Drs. Miguel F. Gracia and Robert A. Wetzler, qualified psychologists who had examined Olson.

Olson walked away from the State Hospital in 1972 without permission. On February 17, 1977, an order was entered for the issuance of a bench warrant against Olson "for purposes of determining whether he should be released from custody of" the State Hospital. Olson was summarily returned to the State Hospital. From 1972 until 1977 Olson lived in Great Falls with his wife and family. On September 1, 1977, Olson assaulted the same woman but the charges were subsequently dismissed.

Olson petitioned for discharge on December 27, 1977. He was examined by Drs. Pierce and Gelernter whose reports

-2-

were filed with the court at an August 3, 1978 hearing. Appeal was again taken resulting in reversal of the judgment and remanded for further hearing. State v. Olson (1979), _____ Mont. ____, 593 P.2d 724, 36 St.Rep. 761.

On May 25, 1979, the State applied ex parte to the District Court for an order that Olson be examined by Dr. Wetzler. The application was granted and examination held on May 30, 1979. Thereafter a hearing was held on June 13, 1979 and the deposition of Dr. Wetzler filed on June 26, 1979. The court by an order entered August 6, 1979 (hereinafter referred to as the 1979 order) set aside the 1971 order on the basis that it "was procured by the Defendant's fraud upon . . . [the] Court.. . ."

It is from this 1979 order which Olson appeals seeking reinstatement of the 1971 order and prohibiting the District Court from any further proceedings relating to it.

Olson sets forth the following issues on appeal, all of which are conceded by the respondent:

(1) Is this controversy proper for the Montana Supreme Court to exercise original jurisdiction?

(2) Did the District Court deny the appellant due process of law by not giving notice or an opportunity to be heard on the question of setting aside the 1971 order?

(3) Was there sufficient evidence of a fraud for the District Court to set aside the 1971 acquittal order?

(4) Did the August 6, 1979 order place the appellant in double jeopardy in violation of the Fifth Amendment to the United States Constitution and the 1972 Mont. Const., Art. II, §25.

Section 3-2-204(1), MCA, states:

"The supreme court may affirm, reverse, or modify any judgment or order appealed from and may direct

-3-

the proper judgment or order to be entered
or direct a new trial or further proceedings
to be had."  (Emphasis added.)

This statute gives to this Court the power to remand a case

to a lower court accompanied by instructions that direct

further action be taken by it in accordance with those in-

structions.  This jurisdiction recognizes the principle

that a lower court cannot ignore an appellate court's mandate

in disposing of a case after it has been returned to the

lower court.  See In Re Stoian's Estate (1960), 138 Mont. 384,

357 P.2d 41.

> This Court in Stoian said:

> "'On the remand of the cause after appeal, it
> is the duty of the lower court to comply with
> the mandate of the appellate court and to obey
> the directions therein . . . the trial court
> commits error if it fails to follow the directions
> of the appellate court.. . .'

> "This court also has held that the district
> court cannot refuse to carry out its mandate
> when a case has been remanded to the district
> court for further proceedings.  In Montana Lumber
> & Mfg. Co. v. Obelisk Mining & C. Co., 16 Mont.
> 117, 40 P. 145, the district court was reversed
> because it refused to follow the mandate laid
> down by this court on a former appeal of the same
> case.  (Montana Lumber & Mfg. Co. v. Obelisk
> Mining & C. Co., 15 Mont. 20, 37 P. 897), wherein
> the district court had been directed to include
> certain property in a decree of foreclosure."  In
> Re Stoian's Estate, 357 P.2d at 45; Jangula v. United
> States Rubber Company (1967), 149 Mont. 241, 244,
> 425 P.2d 319, 321.

The District Court in the present case was in error for

not following the mandate of this Court as set forth in our

earlier opinion of this year.  The specific instructions of

this Court were as follows:

> ". . . we conclude that this cause must be
> remanded for further testimony on the specific
> question of whether Olson's antisocial behavior
> as illustrated in the incidents involving Karla
> White have any relationship to any mental disease
> or defect currently suffered by Olson.  (Giving
> citations.)  The point to be determined by the
> District Court is whether Olson's present 'danger-
> ousness', if any, is related to or growing out of
> the abnormal mental condition he exhibited in 1970.

-4-

> "The mere fact that Olson may have a tendency
> towards antisocial behavior is not sufficient
> to warrant his continued confinement in Warm
> Springs. See, Harris v. United States (D.C.
> App. 1976), 356 A.2d 630, 632. If Olson does
> not suffer from a mental disease or defect which
> causes this behavior, there is no reason for
> continuing to include him in the exceptional
> class of people discussed earlier. Baxstrom v.
> Herold (1966), 383 U.S. 107, 114-15, 86 S.Ct.
> 760, 764-65, 15 L.Ed.2d 620, 625-26. The ordinary
> punishments of the criminal justice system are
> adequate to handle Olson's future criminal conduct,
> in such circumstances.

> "We also point out that the District Court is not
> limited to either recommit Olson to Warm Springs
> or release him unconditionally. Section 95-508
> gives the District Court authority to release
> conditionally persons committed to the State
> Hospital by placing such conditions as it deems
> necessary on the release. But see, Application
> of Zion (1978), Mont., 585 P.2d 1084, 35 St. Rep.
> 1475. On remand, the District Court should not
> foreclose the possibility of conditional release
> as a proper means of balancing Olson's interest
> in liberty against society's interest in protection
> from potentially dangerous persons. Application
> of Zion, 585 P.2d at 1087, 35 St. Rep. at 1478;
> Hill v. State, 358 So.2d at 209." (Emphasis added.)
> State v. Olson (1979), ____ Mont. ____, 593 P.2d
> at 731-732, 36 St.Rep. at 770-771.

The 1979 revocation order of the District Court was

invalid for several reasons, one of which was / the usurpation

of one of the primary functions of this Court. The District

Court attempted the exercise of an appellate power and as

such is invalid. By means of its 1979 revocation order it

attempted to vacate an earlier District Court judgment which

had become the law of the case. By so doing the lower court

not only trampled on Olson's rights of notice and hearing

but also exposed him to double jeopardy.

The District Court is now instructed to determine Olson's

dangerousness, if any, and if release is justified then

set suitable conditions for his release consistent with what

we have presently discussed and quoted from our earlier

opinion.

Accordingly, the 1979 order of the District Court is

reversed and the cause remanded for further proceedings.

-5-

_____
                  Justice

We Concur:

_____
            Chief Justice

_____

_____
                 Justices

-6-

Mr. Justice John Conway Harrison specially concurring:

I agree that the trial judge here has no authority to set aside the judgment of a previous trial judge that "petitioner was not guilty by reason of insanity" and thereby commit him to the State Hospital for treatment. However, I agree with statements made by Judge Holter that a fraud was perpetrated, not only on the court, but on the people of Montana. See my dissent in State v. Olson (1979), ____ Mont. ____, 593 P.2d 724, 732, 36 St.Rep. 761, 771.

Our law allowing the finding of "not guilty by reason of insanity," when applied to sexual crimes, creates a "Catch 22" situation. The professional testimony that put petitioner in a position to benefit from such a plea now tells the court that he never should have been sent to the State Hospital because he could not have been beneficially treated. As I understand the testimony of the psychiatrists, these types of offenders belong, not in the State Hospital, but in prison.

This petitioner was convicted of raping two women in Lincoln County. The conviction was set aside due to errors made by the trial judge in refusing to allow the prosecution to permit voir dire examination of prospective jurors on subjects related to the insanity defense. However, there was no question of his guilt of the crimes charged. When brought for retrial, the court, on the basis of psychiatric testimony at the first trial, allowed the entrance of a plea of not guilty "by reason of insanity" and sent petitioner to the State Hospital. The jury at petitioner's first trial found that he knew what he was doing and did not suffer from a degree of mental disease or disorder which prevented his responsibility for committing the offense charged.

Years ago, before psychiatry refined the degrees of insanity, when one went berserk, regardless of the degree of insanity, he was said to be "crazy"; a word that covered every aspect of mental illness. We know better now. Some writers have pronounced the change toward treating mental disease an exhibition of such human quality as the moral constitution. Rules of law, as well as legislation, are predicated on patterns of human behavior. Certainly, they furnish the ideal for a democratic society to aspire to, but here the petitioners was far from being possessed of such a moral constitution. In addition, the test for determining his competency did not exact too much. He carefully planned his assaults on the two women when their husbands were away at work and promptly fled the scene after the commission of the rapes. I believe the evidence showed him legally sane. It is possible this is a case of depravity rather than one of insanity. Where the dividing line is between them, we do not know. It may be that the law has not developed the proper technique; but, such as we have, no body of men and women is better qualified to cope with the problem than a carefully selected jury.

In view of what the psychiatrists now testify, this type of offender does not suffer from mental defects treatable at the State Hospital. It now becomes a legislative matter where such offenders are to be confined and whether they are entitled to the use of the plea of "not guilty by reason of insanity."

_____
                    Justice

-8-