**In re MISTY LEE H. and Jessica H.**

Supreme Judicial Court of Maine.

Argued June 11, 1987.

Decided Aug. 6, 1987.

**332**

Donald J. Gasink (orally), Gasink and Weisberger, Augusta, for appellant.

Christopher C. Leighton, Susan C. Cookson (orally), Asst. Attys. Gen., Dept. of Human Services, Augusta, John C. Sheldon, Morton, Sheldon & Underkuffler, Farmington, for appellees.

Before McKUSICK, C.J., and NICHOLS, GLASSMAN, SCOLNIK and CLIFFORD, JJ.

CLIFFORD, Justice.

Lori P., the mother of Misty Lee H. and Jessica H., pursuant to 22 M.R.S.A. § 4006 (Supp.1986) appeals from a judgment of the District Court, Farmington, terminating her parental rights pursuant to 22 M.R.S.A. § 4055 (Supp.1986). On appeal, she contends that the District Court erred in concluding that there was clear and convincing evidence supporting termination. In particular, she argues that the record does not sufficiently support the court's finding that termination is in the best interests of the children, section 4055(1)(B)(2)(a). She further contends that the record does not support the court's alternative findings that she is unwilling or unable to protect the children from jeopardy and that those circumstances are unlikely to change within a time reasonably calculated to meet the children's needs, section 4055(1)(B)(2)(b)(i), and that she failed to make a good faith effort to rehabilitate and reunify with the children pursuant to section 4041, section 4055-(1)(B)(2)(b)(iv). We conclude that there was clear and convincing evidence in the record to support the District Court's findings, and therefore affirm the judgment.

## I.

On June 24, 1986, the Department of Human Services (Department) filed a petition for termination of Lori's parental rights pursuant to 22 M.R.S.A. § 4055 (Supp.1986). At a hearing on the petition, the District Court heard substantial evidence showing that Lori, who gave birth to Misty and Jessica while a teenager, was prone to violent behavior, had severe emotional problems and lacked basic parenting skills, resulting in her children's (particularly Misty's) physical and emotional neglect while in Lori's custody. Among the evidence presented concerning Lori's violent outbursts and emotional instability, the District Court heard testimony regarding an incident on April 22, 1985, following an argument with her boyfriend, John G., in which Lori, in the presence of the children, threw a television set out the door of her home, punched her boyfriend and a neighbor, broke several windows in her car and slashed the car's tires. Lori was charged with assault and later placed on probation for a period of one year. The District Court also heard evidence showing that Lori, who was diagnosed as having a borderline personality disorder, was informed that psychotherapy was crucial to her effective parenting but that she consistently resisted meaningful counseling by her failure to make a good faith effort to address those areas of concern to her psychotherapists, despite her promise to work on these areas in connection with her reunification agreements with the Department. On December 11, 1986, the District Court found by clear and convincing evidence that termination of Lori's parental rights was in the best interests of the children. The court further determined by clear and convincing evidence that the mother was unwilling or unable to protect the children from jeopardy and that these circumstances were unlikely to change within a time that was reasonably calculated to meet the children's needs, and that the mother failed to make a good faith effort to rehabilitate and reunify with the children.

## II.

██ We first address whether the District Court erred in finding by clear and convincing evidence that termination was in the best interests of the children, section 4055(1)(B)(2)(a). In reviewing the District

Court's findings, we examine the entire record to determine whether that court rationally could have found clear and convincing evidence to support its factual conclusions. *In re Chesley B.*, 499 A.2d 137, 139 (Me.1985). "Where clear and convincing evidence is required, the appropriate standard of appellate review is 'whether the factfinder could reasonably have been persuaded that the required factual findings [were] proved to be *highly probable.*' " *In re John Joseph V.*, 500 A.2d 628, 629 (Me. 1985), quoting *Taylor v. Commissioner of Mental Health*, 481 A.2d 139, 153 (Me. 1984) (overruling *Horner v. Flynn*, 334 A.2d 194 (Me.1975)) (emphasis in original).

The trial judge made the following findings in concluding that termination was in the best interests of both Misty and Jessica:

> The court ... finds, by clear and convincing evidence, that termination of parental rights is in the best interest of these children. Expert testimony was presented proving it is critical to the welfare of both youths that a permanent plan for placement be adopted without further delay. Given the family history of violence, and based upon the developmental needs of these children, the court is not disposed to order further reunification efforts by the Department with the mother ...

The District Court judge's finding on the issue of the best interests of the child is entitled to substantial deference, in that the judge is directly able to evaluate the testimony of the witnesses:

> The trial justice who hears and is able to appraise all the testimony of the parties and their experts in social work and child psychology ... exercises a broad discretion, and is charged with a correspondingly weighty responsibility, to determine the particularly sensitive question of a child's best interests. His judgment, when properly exercised on the basis of the evidence before him, is entitled to very substantial deference.... An appellate court's independent evaluation of

the evidence is especially inappropriate on a delicate issue of this sort.

*Cooley v. St. Andre's Child Placing Agency*, 415 A.2d 1084, 1086 (Me.1980) (denial of petition for writ of habeas corpus); *see also In re Chesley B.*, 499 A.2d at 138–39 ("As always, we leave to the trial judge questions of credibility and weight to be given testimony; he alone has had the opportunity to observe the witnesses").

In reviewing the record, we find evidence of a clear and convincing nature in support of the court's determination. There is evidence that Misty suffered both physical neglect and emotional harm. Although there was evidence that Jessica had not suffered the same degree of neglect as her sister, the court nevertheless could have considered Jessica's removal from her mother's custody at an early age and having spent most of her life in foster care as factors in her improved adjustment and self-confidence, as well as evidence of a return of Jessica's emotional problems after visits with her natural mother. Finally, there was competent evidence in the record that Lori's violent behavior, instability, and unwillingness to take responsibility for her own emotional problems resulted in an unsafe and unstable home environment for the children. This evidence, when viewed in the context of the express statutory policy of placing children in a permanent environment where reunification is not possible,[1] supports the court's conclusion of high probability that termination was in the best interests of the children.

### III.

We next consider whether the District Court erred in finding by clear and convincing evidence that the mother is unwilling or unable to protect her children from jeopardy, and that these circumstances are unlikely to change within a time that is reasonably calculated to meet the children's needs, section 4055(1)(B)(2)(b)(i). "Jeopardy" is defined by statute as serious abuse or neglect. 22 M.R.S.A. § 4002(6) (Supp.1986).

---

1. *See* 22 M.R.S.A. §§ 4003(4) & 4050.

The trial judge's finding regarding Lori's inability or unwillingness to protect her children from jeopardy is based primarily on his finding that she frequently indulged in violent outbursts and consistently refused to address her behavior in therapy:

The court further finds, by clear and convincing evidence, that mother has a history of violent behavior. Mother has consistantly [sic] refused to address her childhood issues and her inability to control her anger. Mother acknowledged she engaged in a violent outburst five days after the children had been returned to her in April, 1985. This consisted of her throwing a TV set out of her residence, of smashing the windows of the family motor vehicle and of slashing the tires, and of punching John [G.], her boy friend, in the mouth at least twice.

There is also ample evidence in the record to support the court's finding that Lori is unable or unwilling to protect Misty and Jessica from jeopardy within a time reasonably calculated to meet their needs. For example, there is evidence that the mother had difficulty controlling her anger and had a history of "episodic impulsive outbursts" which she had made little progress in controlling. The mother's violent outburst of April 22, 1985, for example, demonstrates a lack of disposition or inclination to take responsibility for protecting the children from harm. Although the violence was not directed at the children on that occasion, Misty, who observed the incident, suffered emotional problems as a result.

■ Moreover, there is evidence in the record that Lori neglected her children. The children's foster mother stated that Misty showed signs of neglect when the children came to live with them in February of 1984:

Misty [then 3 years old] was still in diapers. She would take her sister's bottle whenever she had a chance and still nurse from a bottle. Her teeth were in very, very bad decay.... [W]hen we took her to the doctor's, she had four extracted, four capped, and four others filled,

... It took a few baths to get them [Misty and Jessica] clean. Their hair was very drab and uneven. They just looked neglected—at least Misty did.

Finally, there is evidence of the mother's resistance to mental health counseling to address the issues that contributed to the placement of the children in jeopardy. The District Court could have viewed these incidents as evidence of "jeopardy" in the sense of neglect or the "[d]eprivation of adequate ... supervision or care...." *See* 22 M.R.S.A. § 4002(6)(B) (Supp.1986).

■ Having found that the District Court was justified in finding to a high probability that Lori was unable or unwilling to protect her children from jeopardy within a time calculated to meet the children's needs, we need not consider whether the court's alternative ground for terminating Lori's parental rights (namely, that she failed to make a good faith effort to rehabilitate and reunify with the children) was supported by clear and convincing evidence. Either of the District Court's findings under 22 M.R.S.A. § 4055(1)(B)(2)(b) is independently adequate to justify termination. *In re Randy Scott B.*, 511 A.2d 450, 455 (Me.1986).

Accordingly, the entry is:

Judgment affirmed.

McKUSICK, C.J., NICHOLS and SCOLNIK, JJ., concurring.

GLASSMAN, Justice, dissenting.

In light of the strict standard of proof required to terminate parental rights and the inconclusive evidence presented in this case, I must respectfully dissent. It is well established that a mother's right to the care and custody of her children is a fundamental liberty interest protected by the fourteenth amendment of the federal constitution and article I, section 6–A of our state constitution. *See Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Danforth v. State Dept. of Health & Welfare*, 303 A.2d 794,

800 (Me.1973).[1] The commanding nature of the parental interest and the permanent consequences of the termination of parental rights led the United States Supreme Court to conclude that proof in these proceedings must at a minimum be by clear and convincing evidence. *Santosky v. Kramer*, 455 U.S. at 758–770, 102 S.Ct. at 1397–1404.

In this case the District Court, by its order dated December 11, 1986, found that Lori was unwilling or unable to protect her children from jeopardy and these circumstances were unlikely to change within a time reasonably calculated to meet the needs of the children. *See* 22 M.R.S.A. § 4055(1)(B)(2)(b)(i) (Supp.1986). "Jeopardy" as defined in 22 M.R.S.A. § 4002(6) (Supp.1986) means:

[S]erious abuse or neglect, as evidenced by:

A. Serious harm or threat of serious harm;

B. Deprivation of adequate food, clothing, shelter, supervision or care, including health care when that deprivation causes a threat of serious harm; or

C. Abandonment of the child or absence of any person responsible for the child, which creates a threat of serious harm; or

D. The end of voluntary placement, when the imminent return of the child to his custodian causes a threat of serious harm.

The jeopardy finding was primarily based on a violent outburst in April 1985 directed at Lori's boyfriend, television set and automobile. Lori's anger was not directed at her children, nor were they endangered. Based on this evidence I do not believe that the District Court reasonably could have been persuaded that it was proved to be "highly probable" Lori's children were subject to "serious harm or threat of serious harm" from future outbursts within the meaning of 22 M.R.S.A. § 4002(6)(A). *See In re John Joseph V.*, 500 A.2d 628, 629 (Me.1985). Far from being highly probable, any future threat to the children posed by Lori's temper is highly speculative.[2]

The finding of jeopardy might also have been based on neglect. The only evidence in this regard was that Misty had poor teeth and "looked neglected" according to the foster mother, whose background and standards for comparison are unknown. There was no evidence that Jessica was neglected, except that her hair was "drab." The evidence did not constitute clear and convincing proof that either girl had been abandoned or deprived of "food, clothing, shelter, supervision or care." 22 M.R.S.A. § 4002(6)(B) and (C).

The District court also found as an alternative ground for termination that Lori failed to make a good faith effort to rehabilitate and reunify with the children. *See* 22 M.R.S.A. § 4055(1)(B)(2)(b)(iv). This finding appears to be based on Lori's resistance to addressing "her childhood issues" and to engaging in "meaningful psychotherapy."[3] The record shows that Lori

---

**1.** The integrity of the family unit has found protection in the due process clause of the fourteenth amendment, the equal protection clause of the fourteenth amendment, the ninth amendment, and the right to privacy. See cases collected in *Danforth v. State Dept. of Health & Welfare*, 303 A.2d at 796–97; *Roe v. Conn*, 417 F.Supp. 769, 777 (M.D.Ala.1976).

**2.** In adopting the elevated standard of proof in a parental rights termination proceeding, the Supreme Court stated this "would alleviate 'the possible risk that a factfinder might decide to [deprive] an individual based solely on a few isolated instances of unusual conduct [or] ... idiosyncratic behavior. Increasing the burden of proof is one way to impress the factfinder with the importance of the decision and thereby perhaps to reduce the chances that inappropri-

ate' terminations will be ordered." *Santosky v. Kramer*, 455 U.S. at 764–65, 102 S.Ct. at 1400–01 (citation omitted) (quoting *Addington v. Texas*, 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979)).

**3.** Lori was a foster child from the age of 22 months.

On December 30, 1985, Lori and the Department signed a Service Agreement providing, *inter alia*, the following recommendations in regard to individual counseling of Lori:
1. Recognizing your ambivalence and dependency needs
2. Trusting your therapist
3. Reviewing your life
4. Resolving your sadness and anger
5. Learn how to express your anger appropriately

made significant progress since the first DHS intervention in May 1981, when she was only sixteen years of age. Lori attended counseling sessions and was genuinely interested in making a secure home for her children. The State offered no proof that exploring Lori's childhood was directly related to the State's interest in ensuring Lori's fitness as a parent. The record as a whole does not show clearly or convincingly that Lori failed to make a good faith effort to rehabilitate and reunify with her children. Moreover, conditioning Lori's fundamental right as a mother on "meaningful psychotherapy" required the District Court to abdicate its role adjudicating constitutional rights to experts who practice that uncertain art. This reliance on experts at almost every stage of termination proceedings increases the ever present risk that such proceedings are vulnerable to judgments based on cultural or class bias. *See Santosky v. Kramer*, 455 U.S. at 763, 102 S.Ct. at 1400.

Although the children's interest alone does not justify termination, I also address the District Court's finding that termination of Lori's parental rights is in the best interest of the children. 22 M.R.S.A. § 4055(1)(B)(2)(a). The District Court and now this court find support for this conclusion in the evidence of "violence" and "physical neglect." Those powerful words provide more heat than light. The court is simply again relying on the single violent outburst in April 1985, which was not directed at the children, and the evidence concerning Misty's teeth. There was no evidence that Jessica had been neglected. The court also relies on the opinion of an expert, who had never observed Lori and the children together, that the children's interests would be best served by permanent placement as soon as possible. The decision to terminate Lori's parental rights

did little to advance this interest. The court recited in its order that termination of Lori's parental rights was in the best interests of the children because of "their strong attachment to their foster family instead of their mother" and "the need for a safe, loving, nurturing and stable home environment." The foster parents, however, testified they were *not* willing to adopt the children, and a DHS caseworker testified that it might take one or two years before such adoption could be completed. Accordingly, the children faced continued uncertainty while adoptive parents were found and thoroughly investigated. *See* 19 M.R.S.A. § 533 (Supp.1986). The absence of a permanent plan for the children's care points up the State's lack of a compelling interest in protecting the two girls from further reunification efforts with their mother. The State should be required to demonstrate by clear and convincing evidence that the consequences in harm to the children of allowing the parent-child relationship to continue are more severe than the consequences of termination of that relationship. *See Alsager v. District Court*, 406 F.Supp. 10, 23–24 (S.D. Iowa 1975), *aff'd*, 545 F.2d 1137 (8th Cir. 1976). Here, the State not only failed to prove by clear and convincing evidence that the children would be harmed by a continuing relationship with their mother, it failed to demonstrate that the consequences of continuation of the parent-child relationship would be more harmful to the children than its termination.

I would vacate the judgment of the District Court.

6. Insight into your parenting.
On May 6, 1986, a caseworker in the DHS wrote to Lori advising her that the Department was discontinuing all reunification efforts, reciting the above 6 recommendations and stating,
> You have not worked on the issues that have been outlined in counseling. Since September, 1985 you have repeatedly stated to the caseworker you were not willing to work on

your childhood and adolescent life history. Due to your failure to work on the treatment issues ... the children would be in circumstances of jeopardy if placed with you. These circumstances are unlikely to change within a time which is reasonably calculated to meet the children's needs. You have been unwilling to rehabilitate and reunify with your children.