2002 ME 159

**In re Michaela C.**

Supreme Judicial Court of Maine.

Argued: May 8, 2002.
Decided: Oct. 22, 2002.

E. Chris L'Hommedieu, (orally), Lewiston, for appellant.

G. Steven Rowe, Attorney General, Aria eee, Asst. Attorney General (orally), Matthew Pollack, Asst. Attorney General, Christoher Leighton, Asst. Attorney General, Elizabeth A. McCullum, Augusta, C.H. Spurling, Gardiner, (for paternal grandmother), for appellees.

Karen Mitchell, Norridgewock, Guardian ad Litem.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CLIFFORD, J.

[¶ 1] The mother of Michaela C. appeals from the judgment of the District Court (Augusta, *Westcott, J.*) terminating her parental rights to her daughter pursuant to 22 M.R.S.A. § 4055 (1992 & Supp.2001).[1] The mother challenges, *inter alia,* the trial court's exclusion of certain medical evidence and the sufficiency of the evidence. We affirm the judgment.

[¶ 2] Michaela was born in February of 1997. She was diagnosed with cystic fibrosis at the age of seven months. She was hospitalized at Maine Medical Center twice in 1998 for, among other things, malnourishment and failure to thrive. During her second hospitalization, in November of 1998, the Department of Human Services sought, and the court (*Vafiades, J.*) granted, an ex parte preliminary protection order. An agreed on preliminary protection order followed (*Perry, J.*), giving the Department custody of Michaela. When she was released from the hospital, the Department placed Michaela with her paternal grandmother.[2]

[¶ 3] At the jeopardy hearing in January of 1999, the mother agreed to an order finding that Michaela was in circumstances of jeopardy to her health and welfare. The stipulated order entered by the court (*Vafiades, J.*) stated that:

> Jeopardy exists because Michaela ... has a serious [eating]/feeding disorder which complicate[s] her cystic fibrosis and failure to thrive diagnosis. If not properly treated and managed these present a serious risk to her health. [The mother] ... has in the past failed

---

1. Michaela's father is not a party to this appeal. The Department sought to terminate the father's parental rights, but the proceedings were bifurcated as to him because he indicated that he would consent to termination if the mother's parental rights were terminated.

2. Although she has not filed a brief on appeal, the paternal grandmother sought and was granted intervenor status as a foster parent and grandparent, and participated in the termination hearing.

to appreciate the seriousness and complexity of the problem, thus creating jeopardy for the minor child. [The mother] ... is now working to resolve these issues, but is not yet at the point where jeopardy has been alleviated.

[¶ 4] The order provided for continued placement of Michaela with the paternal grandmother. The mother was ordered to follow a reunification/rehabilitation plan that included individual counseling and other services, and to establish independence from her mother. The mother was allowed regular, unsupervised visitation with Michaela, but was ordered "not to provide Michaela with candy, snacks, drinks or meals."

[¶ 5] After hearing testimony at a judicial review hearing, the court (*French, J.*) found that during unsupervised visits the mother had fed Michaela in violation of the jeopardy order, and ordered that future visits be supervised. The Department and the mother agreed that Michaela would be referred to an in-patient feeding program at the Kennedy Krieger Institute in Baltimore. Michaela was a patient at Kennedy Krieger for several weeks in early 2000 and then returned to placement with her paternal grandmother, who had been trained at Kennedy Krieger in the detailed feeding program developed there for Michaela.

[¶ 6] In April of 2000, the mother filed a motion for an independent medical examination of Michaela by Dr. William Boyle of the New Hampshire Cystic Fibrosis Clinic. The court (*French, J.*) granted the mother's motion, stating that "[t]he issue of jeopardy shall not be relitigated" at the termination hearing but that "[f]or the limited purposes of reviewing the matter, and if necessary, developing a permanency plan, expert [medical] testimony will be considered."

[¶ 7] Throughout the proceedings confidential information was repeatedly disclosed to the media. At the first hearing in November of 1998, the court (*Perry, J.*) orally cautioned the parties and others present in court, including Michaela's maternal grandmother, that by statute the proceedings were confidential and were not to be discussed with the press. Notwithstanding this admonition, the maternal grandmother repeatedly spoke to the press and disseminated confidential information concerning the case to the *Kennebec Journal* and other media outlets, to the extent that on one occasion Michaela saw herself on the television news and asked about it. It does not appear that the mother was the instigator of this disclosure, but she tolerated it and to some degree cooperated in it. In July of 2000, the court (*Worth, J.*) granted the Department's motion to allow it to disclose information to counter the inaccurate picture given to the press by the mother and the maternal grandmother. The court (*Worth, J.*) subsequently denied a motion by the mother for relief from the "gag order."

[¶ 8] The Department's petition for termination of the mother's parental rights was heard over four days between October of 2000 and January of 2001. One major focus of the evidence was the mother's ineffectual attempts to comply with the rehabilitation goals established at the time of the jeopardy order. A psychologist who evaluated the mother in January of 1999 testified that she needed long-term, motivated treatment. He diagnosed her as having a personality disorder with passive dependent features, leading to her difficulty in focusing on Michaela's needs and in providing a structured response to Michaela's problems. Two counselors testified that the mother had discontinued therapy with them and had made little progress; she did not think she had anything to work on; she wanted independence from her

own mother but was unwilling to do anything about it, so that her mother continued to dominate her; she was shown to be unable to feed Michaela or to give her physical therapy without becoming overly emotional; and she continued to live an immature lifestyle, as evidenced in the past by her associations with abusive men and staying out late so that she was frequently tired and slept through or forgot appointments.

[¶ 9] There was testimony from numerous other witnesses that Michaela's mother continues to be dominated by her own mother, Michaela's maternal grandmother, and is unable to live on her own or make decisions concerning Michaela without her mother's interference. The maternal grandmother suffers from serious psychological problems of her own, has disrupted visitations in the past, has repeatedly given confidential information concerning the child protective proceedings to the media, has given Michaela chocolate milk during a visit in violation of medical instructions, and has disagreed with the opinions of Michaela's doctors.

[¶ 10] Other witnesses testified that a strong bond exists between the mother and Michaela, and that after the disruptive maternal grandmother was excluded from the visits between the mother and Michaela, those visits were affectionate and appropriate.

[¶ 11] The paternal grandmother testified that she wants to adopt Michaela, and that if allowed to adopt her she would permit the mother to visit with Michaela. She described her stable, well-organized home life with Michaela and explained the detailed feeding regimen that she had been trained in at Kennedy Krieger and the positive results this has had for Michaela's eating.[3]

[¶ 12] Eileen Johnson, L.C.S.W., who performed a "best interest evaluation" for the Department, concluded that termination is in Michaela's best interest because the paternal grandmother, who Michaela spends most of her time with, is Michaela's "primary attachment figure." The guardian ad litem concluded that termination of the mother's parental rights was not in Michaela's best interest because of the bond between Michaela and the mother. The guardian ad litem, however, did recommend that reunification efforts cease because the mother had not made the changes in her life necessary to allow her to care for Michaela.

[¶ 13] There was substantial dispute at the termination hearing about the mother's attempts to present expert medical evidence, in particular, evidence from Dr. Boyle. The evidence sought to be presented by the mother concerned Michaela's eating/feeding disorder and went to the way the child had gained and lost weight in the past. Several conferences between the court and counsel concerning the purpose for which this medical evidence was being offered occurred throughout the termination hearing. The evidence was originally proffered to demonstrate that the court erroneously relied on Department evidence that Michaela was not being properly cared for when in the mother's custody, and was much better off medically when placed with the paternal grandmother. The mother argued that her medical evidence showed that the court's reason for the original removal of the child from the mother's custody, i.e., that the child failed to thrive while in the mother's custody causing her to be in circumstances of

---

**3.** The mother testified that she wanted to be trained in the feeding regimen as well, but her request to do so was refused.

jeopardy, was not medically sound. The trial court justifiably excluded the evidence concluding throughout most of the termination hearing that the mother was attempting to relitigate the court's prior findings that the child was in circumstances of jeopardy while in the custody of the mother,[4] findings that had been previously agreed to by the mother.[5]

[¶ 14] Near the end of the termination hearing, however, the mother made clear that she was offering the medical evidence on the issues involved in termination, and that the evidence was relevant to at least some of the issues involved in termination. The court, however, denied the mother's motion to allow the record to remain open so that she could submit the medical evidence.

[¶ 15] The mother, at the court's suggestion, filed a motion for reconsideration, and at the court's request, presented an offer of proof as to the medical evidence. The proffer was that Michaela had gained weight more quickly when in the mother's care, than when custody was with the Department. The proffer also included the testimony of Dr. Boyle concerning his examination of Michaela and his opinion that weight gain is an accepted measure in failure to thrive cases and that the mother was not responsible for the child's failure to thrive. The court denied the motion to admit the medical evidence.

[¶ 16] In terminating the mother's parental rights to Michaela, the court concluded by clear and convincing evidence that the mother is unwilling or unable to protect Michaela from jeopardy and those circumstances are unlikely to change within a time reasonably calculated to meet Michaela's needs, 22 M.R.S.A. § 4055(1)(B)(2)(b)(i); the mother is unwilling or unable to take responsibility for Michaela within a time reasonably calculated to meet Michaela's needs, section 4055(1)(B)(2)(b)(ii); and, the mother has failed to make a good faith effort to rehabilitate and reunify with Michaela, section 4055(1)(B)(2)(b)(iv). The court also concluded that termination of the mother's parental rights is in Michaela's best interest, section 4055(1)(B)(2)(a). This appeal by the mother followed the court's denial of the mother's motion for reconsideration of its decision to exclude the medical evidence and the entry of the order terminating her parental rights.

I.

■■■■ [¶ 17] In a termination proceeding, before the court even addresses whether termination of parental rights is in the best interest of the child, the court has to determine whether the parent is fit to parent the child. *In re Scott S.*, 2001 ME 114, ¶ 19, 775 A.2d 1144, 1150. The Department has the burden to prove one or more of the statutory grounds of parental unfitness by clear and convincing evidence. *In re Kafia M.*, 1999 ME 195, ¶ 9, 742 A.2d 919, 923. Where clear and convincing evidence is required, the appropriate standard of appellate review is whether the District Court could reasonably have been persuaded that the required factual findings were proved to be highly probable. *In re Christopher J.*, 505 A.2d 795, 797 (Me.1986).

■■■■ [¶ 18] The mother challenges the sufficiency of the evidence to support the parental unfitness findings of the court.

---

4. The court stated on the record that it had not excluded, and would not exclude, evidence related to Michaela's current medical condition.

5. The mother had agreed to the findings of jeopardy at the jeopardy hearing and at two separate judicial reviews.

She also contends that the court impermissibly excluded the medical evidence she presented on the eating/feeding disorder of Michaela, and that the exclusion of that evidence adversely impacted the findings of parental unfitness and best interest.

[¶ 19] The dispute over the court's rejection of the mother's medical evidence is complex, and its impact on at least one of the court's findings as to parental unfitness, in particular the finding that the mother is unable to protect Michaela from jeopardy and those circumstances are unlikely to change within a time reasonably calculated to meet Michaela's needs pursuant to section 4055(1)(B)(2)(b)(i), is difficult to determine. Although the mother did not make clear to the trial court a proper reason for the admission of the medical evidence until very late in the termination proceedings, at the conclusion of the hearing, and in her motion for reconsideration, she did sufficiently articulate reasons why the evidence should be admitted, and its exclusion by the court was error. The excluded medical evidence, although directed primarily at the trial court's earlier determinations that the child was in circumstances of jeopardy while in the mother's care based on the child's failure to thrive, has some relevance to the court's finding pursuant to section 4055(1)(B)(2)(b)(i) that the mother is unable to protect Michaela from jeopardy, in particular, jeopardy arising out of the eating/feeding disorder.

■ [¶ 20] Although the trial court erred in excluding the medical evidence, it is highly probable that the error did not affect the outcome of the termination proceedings and, therefore, is harmless. *See In re Scott S.,* 2002 ME 114, ¶¶ 31–32, 775 A.2d at 1154 (error is harmless when it is highly probable that the error did not affect the outcome of the case). The error is harmless because in order for termination to be ordered, the court needs to find only *one* of the statutory grounds for unfitness, *see In re David G.,* 659 A.2d 859, 861 (Me.1995), and this case involves much more than whether the mother is able to properly feed Michaela.

[¶ 21] The court's finding by clear and convincing evidence that the mother is unable to take responsibility for Michaela within a time reasonably calculated to meet Michaela's needs, section 4055(1)(B)(2)(b)(ii), is based on the fact that the mother is not an independent, mature, and responsible parent, and is unable to provide Michaela, a special needs child, with the basic daily care that she needs, such as Michaela's daily chest physical therapy. Moreover, the court also found by clear and convincing evidence that the mother failed to make a good faith effort to rehabilitate and reunify with Michaela, section 4055(1)(B)(2)(b)(iv). Individually, either of those findings constitutes sufficient grounds of parental unfitness on which to base a termination of the mother's parental rights. *In re David G.,* 659 A.2d at 861. The medical evidence would have had no impact on either finding. Nor was the medical evidence sufficiently relevant to the determination that termination of the mother's parental rights is in Michaela's best interest pursuant to 22 M.R.S.A. § 4055(1)(B)(2)(a). The court's best interest determination involves issues beyond the mother's lack of competence to feed the child. It is highly unlikely that the court's best interest finding would be affected by the excluded medical evidence.

■ [¶ 22] In reviewing a decision to terminate parental rights, a decision that is highly factual, we recognize "the unique opportunity of the trial court to assess the evidence," *In re Caroline M.,* 576 A.2d 743, 745 (Me.1990), and view the evidence in a

light most favorable to the Department, *In re Chesley B.*, 499 A.2d 137, 140 (Me.1985).

[¶ 23] Contrary to the mother's contention, there is ample evidence to support the court's findings by clear and convincing evidence that the mother has failed to take responsibility for Michaela within a reasonable time, 22 M.R.S.A. § 4055(1)(B)(2)(b)(ii), and has failed to make a good faith effort to rehabilitate and reunify with Michaela pursuant to section 4055(1)(B)(2)(b)(iv). The mother was consistently resistent to following the treatment plan she agreed to at the time of the jeopardy order and she failed to make a serious effort to resolve her own problems, problems that severely compromise her ability to care for Michaela.

## II.

�▬▬ [¶ 24] The mother is also unpersuasive in her contention that the evidence is insufficient to support the court's finding by clear and convincing evidence that termination of her parental rights is in the best interest of Michaela. There is substantial evidence in the record that was relied on by the District Court to justify the conclusion that termination of the mother's parental rights is in Michaela's best interest. The mother has a dependency disorder and is excessively dependent on her own mother. The mother is unable to function as a responsible adult, and has little motivation for treatment. She cannot fully appreciate the very special needs (cystic fibrosis and an eating/feeding disorder) of Michaela, and is unable to provide basic daily care for Michaela.

[¶ 25] Michaela has been in the custody of the Department since 1998. Michaela's paternal grandmother has been Michaela's custodian for several years and desires to adopt the child.[6] Michaela has responded well to the grandmother's care, and to rehabilitative services that the grandmother has assured she receives. The District Court found that there is "love, affection and strong emotional ties" between the child and the custodial grandmother, and that the grandmother "has the capacity and willingness to nurture the child and provide her with a safe, predictable and comfortable home." Michaela considers the grandmother's home to be her home.

▬▬ [¶ 26] The mother correctly points out that there is "love, affection and an emotional bond" between her and Michaela. Such attachment, however, is only one of *several* factors that the trial court must consider in determining what is in the best interest of the child. "[T]he child's ability to integrate into a substitute placement or back into the parent's home and the child's physical and emotional needs" are important considerations for the court as well. 22 M.R.S.A. § 4055(2) (Supp.2001).[7] Moreover, just because the mother has a relationship with the child that is not disruptive does not mean that termination cannot be in the child's best interest. *In re David G.*, 659 A.2d at 862. The trial court took into account all of those factors and found that the grandmother "is able to prioritize her time to address [Michaela's]

---

6. Title 22 M.R.S.A. § 4062(4) (Supp.2001) sets out the statutory preference for placement of a child with a person related to that child.

7. Section 4055(2) provides:
   In deciding to terminate parental rights, the court shall consider the best interest of the child, the needs of the child, including the

child's age, the child's attachments to relevant persons, periods of attachments and separation, the child's ability to integrate into a substitute placement or back into the parent's home and the child's physical and emotional needs.
22 M.R.S.A. § 4055(2).

special needs ... [and that Michaela] is in need of consistency and patience ... and requires a great deal of parental skill to nurture her. The *only person [who ] can do that is [the grandmother ]*." (Emphasis added.) Moreover, the trial court considered and specifically rejected the option of long-term foster care, finding that the child had already had multiple disruptions and was in need of consistency.

[¶ 27] The District Court's judgment on the issue of best interest is entitled to substantial deference because that court is able to directly evaluate the testimony of the witnesses.

> The trial justice who hears and is able to appraise all the testimony of the parties and their experts in social work and child psychology ... exercises a broad discretion, and is charged with a correspondingly weighty responsibility, to determine the particularly sensitive question of a child's best interest[ ]. His judgment, when properly exercised on the basis of the evidence before him, is entitled to very substantial deference.... An appellate court's independent evaluation of the evidence is especially inappropriate on a delicate issue of this sort.

*In re Misty Lee H.*, 529 A.2d 331, 333 (Me.1987) (quoting *Cooley v. St. Andre's Child Placing Agency*, 415 A.2d 1084, 1086 (Me.1980)).

[¶ 28] Moreover, the Child and Family Services and Child Protection Act, which governs these proceedings, has a clearly stated policy favoring permanency for children in Michaela's situation. Section 4003(4) provides that it is the intent of the Legislature that the Act "[p]romote the early establishment of permanent plans for the care and custody of children who cannot be returned to their family." 22 M.R.S.A. § 4003(4) (Supp.2001). Section

4050 provides that it is the intent of the Legislature that the Act:

> Allow for the termination of parental rights at the earliest possible time after rehabilitation and reunification efforts have been discontinued and termination is in the best interest of the child;
>
> ... Eliminate the need for children to wait unreasonable periods of time for their parents to correct the conditions which prevent their return to the family; [and]
>
> ... Promote the adoption of children into stable families rather than allowing children to remain in the impermanency of foster care....

22 M.R.S.A. §§ 4050(1)-(3) (1992). *See In re Kayla M.*, 2001 ME 166, ¶ 8, 785 A.2d 330, 332–33 (statutory policy favors permanency).

[¶ 29] If the District Court had adopted long-term kinship or foster care as Michaela's permanency plan, it would have been authorized to enter and periodically review orders designed to address actions by Michaela's noncustodial relatives that impact upon her well-being. The utility of this authority, however, must be considered in light of the practical limits on the court's ability to control familial relationships and behaviors. In view of the high level of family conflict demonstrated during the pendency of this case, the District Court was justified in concluding that its indefinite supervision of Michaela's family relationships would have effectively placed Michaela "in limbo," and would not have achieved the Act's goals of certainty and stability.

[¶ 30] Michaela's future relationship with her mother is a dynamic issue, which will likely have to be revisited throughout Michaela's childhood. Viewed from the perspective of the remainder of Michaela's minority, decisions concerning the nature and frequency of Michaela's contacts with

her mother should primarily be a function of meeting Michaela's developmental and emotional needs, as opposed to seeking to permanently guarantee a legal right of contact. Because Michaela has been in the primary care of a capable grandparent who is willing to adopt her, the District Court rightfully concluded that it is in Michaela's best interest for that grandparent, and not the Department or the court, to shoulder the ongoing responsibility for these decisions along with all other aspects of Michaela's upbringing.

[¶ 31] Our evaluation of the evidence must be undertaken with proper deference to the trial court. The trial court determined that the mother is not able to function as a responsible adult and does not fully appreciate the special needs of Michaela. It further found that the person who can best care for Michaela is her paternal grandmother. The evidence establishes that the court could reasonably have been persuaded that it is highly probable that termination of the mother's parental rights is in Michaela's best interest. Accordingly, that finding is not erroneous.

The entry is:

Judgment affirmed.

SAUFLEY, C.J., dissenting.

[¶ 32] I concur in all parts of the court's well reasoned opinion except its conclusion regarding the best interests of Michaela.

Because I would conclude, on these unusual facts, that the record does not yet support a finding that termination of the mother's parental rights is in Michaela's best interests, I must respectfully dissent. *See* 22 M.R.S.A. § 4055(1)(B)(2)(a) (1992). I also write separately from Justice Dana's dissent, because I agree with the majority's holding today that any evidentiary error that did occur was harmless. Ultimately, I would conclude that it was not the evidentiary issues upon which the court's decision turned, but a question of judicial authority to prevent further disruptions in the child's current beneficial placement that appears to have unnecessarily limited the court's options.

[¶ 33] This case presents several unique circumstances that reflect policy and legal changes in this important area of law. First, the child was placed with her paternal grandmother, consistent with the Legislature's ever-increasing directives to the State agency and the courts to encourage kinship placements where appropriate.[8] Second, the child's mother, while not able to be a custodian for her child, can be a positive force in her life, as demonstrated by the trial judge's finding that there is "love, affection, and an emotional bond" between Michaela and her mother. And finally, other people in the child's and mother's lives have had a negative effect

---

8. For an example of the new statutory provisions regarding kinship care taking effect after the entry of judgment in this case, *see* P.L.2001, ch. 559, § CC–5 (effective March 25, 2002) (to be codified at 22 M.R.S.A § 4041(1–A)(A)(1)(c)(vi)), which states that a rehabilitation and reunification plan must include "[a]ny use of kinship support, including, but not limited to, placement, supervision of visitation, in-home support or respite care." In addition, An Act to Implement the Recommendations of the Committee to Review the Child Protective Services, P.L.2001, ch. 696, § 34 (effective July 25, 2002) (to be

codified at 22 M.R.S.A § 4041(2)(A–2)(2)(b)) [hereinafter Implementation of Committee Recommendations] states: "If the permanency plan provides for a relative or other person to have custody of the child and the court has ordered custody of the child to that relative or other person, the court shall make a finding that continuation of reunification efforts is inconsistent with the permanency plan for the child and order the department to cease reunification unless the parent demonstrates that reunification should be continued and the court determines reunification efforts to be in the best interests of the child."

on the mother's ability to be a nondisruptive presence in her daughter's life.

[¶ 34] In the end, because of the previous disruptions that Michaela had suffered, as well as appropriate concern for Michaela's need for stability, the court concluded that a final severance of Michaela's legal relationship to her mother was necessary. I find no fault with the trial court's conclusion that the mother is not capable of being Michaela's primary caretaker, and I agree with the trial court that the issue here came down to this: could the child's best interests be served in a long-term foster care placement with her paternal grandmother, thus avoiding the final severance of Michaela's legal relationship with her mother? *See* 22 M.R.S.A. § 4055(1)(B)(2)(a) (1992).[9]

[¶ 35] While the trial court answered that question in the negative, I would conclude that a judicial order short of termination would have best served Michaela's needs. With the exercise of authority granted to it through the Act, the court could fashion an order that reduces or eliminates the legal disruptions in Michaela's life and that minimizes any remaining personal disruptions. Such an order, if complied with by the mother and her own mother, would have allowed Michaela to continue to thrive in the loving, competent care of her paternal grandmother, while at the same time allowing continued contact between Michaela and her noncustodial mother. Such a result would, in this unique case, be better for Michaela than the finality or certainty of adoption.

[¶ 36] There can be no question that children need stability in their family relationships, and that termination of parental rights and adoption are appropriate vehicles for assuring that stability in many instances where the child's parents cannot be caretakers. It is time, however, to more thoroughly consider other options when the child has family members who are willing and able to provide a home. The purposes and benefits of kinship care are at the heart of this matter, and Michaela's current placement provides a compelling example of the benefits of kinship care. When she could not be cared for by her parents, she was placed in a safe, loving, stable relative's home. The result is exactly as the Legislature has envisioned it. This physically fragile child receives the benefits of a grandmother who "has the capacity and willingness to nurture the child and provide her with a safe, predictable and comfortable home."

[¶ 37] The reasons for pressing for finality are not necessarily as urgent when the child is cared for in a kinship placement. As is the case here, the child knows and has had contact with her mother. The paternal grandmother agrees that continued nurturing, nondisruptive contact would benefit the child. The court could address the disruption problems through the entry of an order that alleviates the problem of the maternal grandmother's disruption by, if necessary, prohibiting the maternal grandmother from visiting Michaela, restricting her ability to file multiple motions with the court, and restricting her ability to take other actions that would disrupt Michaela's life. Our zeal for permitting every person access to the courts must be tempered to prevent harm to children as a result of unfettered abusive access. Although prohibitions on the filing of docu-

---

9. Michaela's paternal grandmother has no legal responsibility upon termination of the mother's rights to continue to permit visits between Michaela and Michaela's mother, despite her indications at trial that she would, and thus there can be no assurance that such visits will continue. *See, e.g., In re Melanie S.,* 1998 ME 132, ¶ 7, 712 A.2d 1036, 1038 ("[A]n order terminating parental rights deprives the court of any authority to impose a condition that preserves contact between the parent and the child.")

ments with the court are not expressly discussed in the child protection statutory scheme, 22 M.R.S.A. § 4036 (1992 & Supp. 2001) grants the court broad power to fashion individual child protection orders suited to the particular circumstances in each case.[10]

[¶ 38] If the court entered an order limiting the opportunities for disruption of Michaela's home life and legal status, but leaving her mother's parental rights intact, the mother would be given the opportunity to demonstrate that she could be a healthy, noncustodial part of the child's life without causing or allowing disruptions that would harm Michaela. The benefits to Michaela of such a structured order would far outweigh the limitations on the mother's and maternal grandmother's access to frequent litigation. If, in such an arrangement, the mother fails to show that she is capable of being a healthy part of Michaela's life without creating such disruptions, termination would then be appropriate.

[¶ 39] I would also conclude that a recognition of the court's authority to restrict the actions of noncustodial relatives is entirely consistent with the Legislature's recent clarification that a kinship placement may result in a cessation of DHS involvement without requiring a termination of parental rights. See Implementation of Committee Recommendations, P.L.2001, ch. 696, § 34. The court is charged by law with considering numerous principles in fashioning such a protection order, including to "[p]rotect the child from jeopardy to his health or welfare," and "[m]ake disposition in the best interests of the child." 22 M.R.S.A. § 4036(2)(A) & (C) (1992). We have recognized this broad judicial authority numerous times. See, e.g., In re David W., Jr., 568 A.2d 513, 515 (Me.1990) ("22 M.R.S.A. § 4036 grants wide discretion to the court in child protection proceedings concerning custody of the child ....."). Thus, the authority for the court to put into place an order restricting disruptions, but leaving parental rights intact, albeit circumscribed, exists in the statute.

[¶ 40] In this unusual case, I would vacate the judgment terminating the mother's parental rights and return the matter to the trial court for entry of judgment denying the petition for termination of parental rights, and for the entry of further orders consistent with Michaela's best interests.

DANA, J., with whom CALKINS, J., joins, dissenting.

[¶ 41] I would vacate the judgment for two reasons. First, the error in excluding

---

**10.** The statute provides, in pertinent part:

1. Disposition. In a protection order, the court may order one or more of the following:

A. No change in custody;
B. Departmental supervision of the child and family in the child's home;
C. That the child, the custodians, the parents and other appropriate family members accept treatment or services to ameliorate the circumstances related to the jeopardy;
D. Necessary emergency medical treatment for the child when the custodians are unwilling or unable to consent;
E. Emancipation of the child ...;

F. Removal of the child from his custodian and granting custody to a noncustodial parent, other person or the department;
F-1. Removal of the perpetrator from the child's home, prohibiting direct or indirect contact with the child by the perpetrator and prohibiting other specific acts by the perpetrator which the court finds may threaten the child;
G. Payment by the parents of a reasonable amount of support for the child ...;
...
H. Other specific conditions governing custody;
...

22 M.R.S.A. § 4036(1) (1992 & Supp.2001).

the mother's crucial medical evidence was not harmless. Second, there is no evidence in this record, let alone clear and convincing evidence, that termination of the mother's parental rights is in Michaela's best interest.

## I.

[¶ 42] The Court correctly concludes that the trial court abused its discretion by preventing the mother from presenting her medical evidence. Some further analysis is necessary to explain both the nature of the court's error and why it was not harmless.

[¶ 43] Had the mother offered her medical evidence for the sole purpose of challenging the 1999 jeopardy determination, it would have been irrelevant. At a termination hearing, "[t]he question is whether [the parent] can protect [the children] from jeopardy *now* or within a time reasonably calculated to meet their needs." *In re Howard P.*, 562 A.2d 1224, 1227 (Me.1989); *see also In re Kafia M.*, 1999 ME 195, ¶ 12, 742 A.2d 919, 924. On the other hand, evidence offered to show the absence of current jeopardy was relevant. The April 1999 jeopardy order could neither foreclose litigation of current jeopardy at the time of the termination hearing nor relieve the Department of its burden of proving current jeopardy as part of its allegation that the mother is unwilling or unable to protect Michaela from jeopardy within a time reasonably calculated to meet her needs. Because of the higher standard of proof required for termination, the jeopardy order does not have preclusive effect on the issue of jeopardy. *See Grogan v. Garner*, 498 U.S. 279, 284–85, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (holding that prior finding by preponderance standard cannot be given collateral estoppel effect in proceeding governed by clear and convincing standard); RE-STATEMENT (SECOND) OF JUDGMENTS § 28(4) (1982). Moreover, jeopardy was in issue because circumstances could have changed in the intervening period, so that the jeopardy that was agreed to exist almost two years before could have ceased by the time of the termination hearing.

[¶ 44] The trial court correctly noted the distinction between an attack on the 1999 jeopardy determination and litigation of current jeopardy, but misapplied it in a way that prevented the mother from presenting relevant evidence. The court's mistake was to repeatedly interpret the mother's proffer as going only to the first, impermissible purpose. The mother's arguments, although not as clear at all times as they could have been, do not support this interpretation. She consistently argued that she should be allowed to introduce expert testimony regarding Michaela's historical medical condition, which might have shown that the factual assumptions underlying the April 1999 agreed jeopardy order were incorrect, but which was offered not for the purpose of contesting that order but in order to show that there was no *current* jeopardy.

[¶ 45] The court's misinterpretation of the mother's argument appears to stem from an error about the temporal scope of the evidence relevant to the issue of current jeopardy. The court repeatedly excluded evidence of Michaela's medical condition before the jeopardy order as irrelevant, while also stating that it would allow evidence of her current medical condition. Our caselaw, however, does not support drawing such a line. In *In re Nathaniel B.*, 1998 ME 99, ¶ 6, 710 A.2d 921, 922, we rejected an argument that the termination court should have looked only at the parents' actions after the issuance of the child protection order (the equivalent of the jeopardy order under

the prior statute) in considering parental unfitness. "There is nothing in the statute, and nothing in our past decisions, that limits the temporal scope of the court's examination of evidence to any particular period. We decline to impose such a limit." *Id.* at 922; *accord In re Alexander D.,* 1998 ME 207, ¶ 18, 716 A.2d 222, 228. Evidence regarding the period after the April 1999 jeopardy order was obviously relevant, *see, e.g., In re Scott S.,* 2001 ME 114, ¶ 15, 775 A.2d 1144, 1150, but evidence of Michaela's past medical condition, particularly of her condition while in the care of her mother and maternal grandmother before November 1998, was also relevant to the issues of her best interest and whether she would be in jeopardy if returned to her mother's care in late 2000 or early 2001.

[¶ 46] The cumulative effect of all the court's rulings on the medical evidence issue, from the pretrial order barring medical testimony on any termination issues to the portion of the termination order refusing to allow the mother to reopen the record to present the testimony of Dr. Boyle, was to deny the mother a fair opportunity to present her relevant medical evidence. The Court correctly concludes that it is highly probable that this error did not affect the trial court's parental unfitness determination, *see In re Scott S.,* 2001 ME 114, ¶ 29, 775 A.2d at 1153–54, because the medical evidence would not have affected the court's finding that the mother failed to make a good faith effort to rehabilitate and reunify with Michaela, *see* 22 M.R.S.A. § 4055(1)(B)(2)(b)(iv) (1992).[11]

[¶ 47] I cannot agree, however, that it highly probable that the error did not affect the trial court's best interest determi-

nation. That determination rested in large part on a finding that Michaela's medical needs could only be met by her paternal grandmother, not by her mother. The court's understanding of those medical needs depended entirely on secondary evidence. Although Michaela's medical problems were an important part of its case for termination, the Department called five mental health professionals as witnesses but did not call a single medical expert. The Department's evidence on the best interest element was weak, as I discuss below. Dr. Boyle's testimony on behalf of the mother would have been the sole expert medical testimony heard by the court and would have greatly increased the court's understanding of Michaela's medical needs. It is distinctly possible, therefore, that the admission of Dr. Boyle's testimony could have led the court to a different conclusion with respect to Michaela's best interest.

[¶ 48] The Department has the burden to demonstrate that an error in a termination of parental rights proceeding was harmless. That burden "is high," and thus "[a]ny doubt will be resolved in favor of the parent." *In re Scott S.,* 2001 ME 114, ¶ 29, 775 A.2d at 1154. There is significant doubt about the impact the mother's medical evidence would have had, and that doubt must be resolved in her favor. The judgment should be vacated and the case remanded for a new hearing at which the mother has a full opportunity to present her medical evidence.

II.

[¶ 49] In deciding whether termination is in a child's best interest, the court must consider "the needs of the child, including the child's age, the child's attachments to

---

11. I also agree with the Court's implicit conclusion that the several additional issues raised by the mother on appeal, other than the exclusion of the medical evidence and the sufficiency of the evidence, do not merit discussion.

relevant persons, periods of attachments and separation, the child's ability to integrate into a substitute placement or back into the parent's home and the child's physical and emotional needs." 22 M.R.S.A. § 4055(2) (Supp.2001). Although evidence of parental unfitness is relevant to the best interest inquiry, *In re Michelle W.*, 2001 ME 123, ¶ 14, 777 A.2d 283, 286, "best interests [is a] distinct element[ ] that must be proved independently," *In re Caroline M.*, 576 A.2d at 745 (Me.1990) (alterations in original). It follows that "the best interest factor alone may prevent the termination of parental rights." *In re Scott S.*, 2001 ME 114, ¶ 21, 775 A.2d at 1151.

[¶ 50] The trial court's conclusion that termination was in Michaela's best interest appears to have rested on the testimony of two witnesses. First, the paternal grandmother's testimony established that she was an appropriate caregiver for Michaela; the court supportably found that "there is love, affection and strong emotional ties between the child and [the paternal grandmother]" and that the paternal grandmother "has the capacity and willingness to nurture the child and provide her with a safe, predictable and comfortable home."

[¶ 51] Second, the court's findings implicitly show reliance on the testimony and "best interest evaluation" of Eileen Johnson. Johnson testified that Michaela's "primary attachment figure" was the paternal grandmother because she had been in the paternal grandmother's care for two years and spent the majority of her time with the paternal grandmother, and that any disruption in this primary attachment could cause serious problems for Michaela

including regression in her eating skills. On this basis Johnson recommended termination.

[¶ 52] This testimony was insufficient for the court to conclude that it was highly probable that termination was in Michaela's best interest. The paternal grandmother's testimony supported a conclusion that it would not be in Michaela's best interest to be removed from her home. Nothing in her testimony, however, supports a conclusion that losing the legal right to contact with her mother is in Michaela's best interest. The paternal grandmother did not deny that there is a strong and loving bond between Michaela and the mother, and in fact testified that she would allow visitation between the two.[12]

[¶ 53] Johnson's evidence is also insufficient to support the court's conclusion. The record discloses serious flaws in that evidence. That the Department, after filing its termination petition, hired Johnson to perform a "best interest evaluation" is troubling in itself. It is difficult to avoid the inference that Johnson's role was essentially to rubber-stamp a decision that the Department had already made, and that the Department's intent in presenting her "independent" evaluation was to usurp the statutorily-mandated role of the guardian ad litem. *See* 22 M.R.S.A. § 4005(1) (1992 & Supp.2001) (requiring guardian ad litem to act in pursuit of best interest of child and to investigate, report, and make recommendations to court). This concern is especially noteworthy here, where, in contrast to the attorney guardian ad litem, Johnson demonstrated in her testimony a lack of understanding of fundamental legal

12. Multiple witnesses, including two visit supervisors, confirmed the existence of the bond between Michaela and her mother. The maternal grandmother (a former Department employee) was a disruptive force, but after she was excluded, the visits between the mother and Michaela were affectionate and appropriate. Michaela loves her mother and looks forward to visits, which had steadily improved in the months leading up to the hearing.

issues regarding Michaela's placement. Moreover, again in contrast to the thorough investigation performed by the guardian ad litem, Johnson's inquiry appears to have been meager: she relied on medical records deemed relevant by the Department and apparently accepted the Department's factual allegations at face value; she refused to interview the mother when the mother requested that her attorney be present (a reasonable request given Johnson's status as the Department's agent); she observed Michaela for only two one-hour visits (one with the paternal grandmother and one with the mother); and she did not evaluate Michaela's attachment to the mother, apparently deeming it irrelevant because the mother was not Michaela's "primary attachment figure."

[¶ 54] The Department's argument on best interest boils down to a contention that Michaela needs permanence and should have her primary attachment to the paternal grandmother permanently guaranteed. The goal of permanence is clearly an important one, mandated by statute. See 22 M.R.S.A. §§ 4003(4), 4050 (1992 & Supp.2001). Michaela's need for permanence, however, cannot by itself support the conclusion that termination of parental rights is in her best interest. If it could, the best interest element would be meaningless and termination would be appropriate whenever parental unfitness is found because all children involved in the child protective process need permanence. Likewise, the fact that Michaela has a primary attachment to a capable and loving foster parent who wants to adopt her cannot by itself be dispositive without regard to her attachment to her natural mother.

[¶ 55] In many cases, evidence that the child's attachment to the natural parent is minimal or nonexistent, or that continued contact with the natural parent would cause the child harm, is crucial to the conclusion that termination of parental rights is in the child's best interest. See, e.g., In re Kafia M., 1999 ME 195, ¶ 16, 742 A.2d at 925 (citing evidence that child "is bonded with the foster parents who want to adopt her, but not bonded to either her mother or father"). This is not such a case. As the guardian ad litem stated in her report, "[a]ll evidence points to the positive and definite nurturing and loving bond between [the mother] and Michaela." This bond is not as strong as the bond between the paternal grandmother and Michaela, but only because the Department had placed Michaela in the paternal grandmother's care for over two years. "Courts should be cautious ... in finding that termination is in a child's best interests when ... the Department restricts the parent-child contact by instituting child protective proceedings and then cites the lack of a normal parent-child relationship as evidence that the 'best interests' test is satisfied." In re Justin T., 640 A.2d 737, 739 (Me.1994).

[¶ 56] There was no evidence that continued contact with the mother would cause Michaela harm. On the contrary, the paternal grandmother and Johnson, the two witnesses relied on by the Department for its best interest argument, both testified in favor of continued contact between the mother and Michaela. The guardian ad litem argued that a legally guaranteed right to such contact was in Michaela's best interest, and I agree that the evidence before the court compels such a conclusion.

[¶ 57] We have recognized in the past that a "child may benefit from preserving a limited relationship with her own [natural parent] despite [the parent's] inadequacies." In re Hope H., 541 A.2d 165, 167 (Me.1988) (vacating judgment for insufficient evidence that termination was in child's best interest). This is particularly true when the child is in the permanent

care of a family member. Thus we have held that it was in the best interest of a child who suffered from failure to thrive and was in the custody of her grandmother to keep contact with her mother despite the mother's unfitness as a parent. *In re Caroline M.*, 576 A.2d at 744–45.

[¶ 58] The trial court stated, as an additional factor in its best interest analysis, that Michaela should not be placed in "limbo"—or as Johnson put it, "the legal business needs to be over." On this record, however, the notion that Michaela would be harmed by future legal proceedings is pure speculation. Various legal arrangements are possible—not just "long-term foster care," referred to in the Court's opinion—that would serve Michaela's best interest by keeping her in the paternal grandmother's care while guaranteeing her right to contact with her mother.[13] Any such arrangement would, to be sure, allow the mother to come back into court at some point in the future and argue that she has changed and should be given another chance to care for Michaela. Conceivably the court might then find that the mother is a fit parent and that placement with her would be in Michaela's best inter-

est, but in that case Michaela would be benefitted, not harmed, by a change. The speculative possibility of future legal proceedings cannot justify severing the healthy and loving parent-child bond that now exists between the mother and Michaela.

[¶ 59] Although stating that "proper deference to the trial court" is required, the Court in fact adopts an attitude of super-deference. If this best interest determination, unsupported by any evidence (let alone clear and convincing evidence),[14] is affirmed, then *every* best interest determination will be affirmed. In that case, the District Court's findings are essentially unreviewable and every appeal from the termination of parental rights is a meaningless exercise and a waste of judicial resources. I cannot believe that the Legislature intended that result when it made parents' right to appeal an integral part of the statutory scheme. *See* 22 M.R.S.A. § 4006 (Supp.2001). I respectfully dissent.

13. For example, Michaela could remain in Department custody while placed with the paternal grandmother, *cf.* 22 M.R.S.A. § 4052(2–A) (Supp.2001) (providing that Department need not file termination petition if it "has chosen to have the child cared for by a relative"); the paternal grandmother could be granted custody of Michaela, *see* section 4036(1)(F) (1992); *In re David W.*, 568 A.2d 513, 515–16 (Me.1990) (affirming grant of custody to grandparents); *see also* 19–A M.R.S.A. § 1653(2)(C) (1998) (permitting court to award parental rights and responsibilities to third person if award to parent would place child in jeopardy); or the paternal grandmother could be made Michaela's legal guardian, *see* 18–A M.R.S.A. § 5–204 (1998).

14. The Court's opinion shows the low point to which the "clear and convincing evidence"

standard has fallen. When we first defined that standard "as that which establishes a factual conclusion to be 'highly probable,'" *Taylor v. Comm'r of Mental Health & Mental Retardation*, 481 A.2d 139, 154 (Me.1984), an important reason was that that definition would "allow[] meaningful appellate review of the lower court's findings," *id.* at 153. In practice, however, it appears that our review in termination of parental rights cases has become indistinguishable from that in cases where the preponderance of the evidence standard is applicable. To provide meaningful appellate review of this constitutionally-mandated higher standard of proof, *see Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), we should be performing a more searching review of the record than the Court's extraordinary deference to the trial court allows.